**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-24432-CIV-ALTONAGA/Simonton**

**EMIGDIO BEDOYA**, *et al.*,

      Plaintiffs,

vs.

**AVENTURA LIMOUSINE &**
**TRANSPORTATION SERVICE,**
**INC.**, *et al.*,

      Defendants.

_____/

**<u>ORDER</u>**

      **THIS CAUSE** came before the Court on Defendants' Motion to Disqualify Plaintiff's Counsel, Richard Celler, Esq. ("Celler") ("Motion to Disqualify Celler") [ECF No. 47], and Defendants' Motion to Disqualify Plaintiff's Counsel, Stacey Schulman, Esq. ("Schulman") and the Law Firm of Morgan & Morgan, P.A. ("Morgan & Morgan") ("Motion to Disqualify Morgan & Morgan") [ECF No. 82].   Plaintiff, Emigdio Bedoya ("Bedoya" or "Plaintiff"), through Celler,[1] filed a Class Action Complaint ("Complaint") [ECF No. 1] on December 9, 2011, on behalf of himself and other employees and former employees similarly situated, against Defendants, Aventura Limousine & Transportation Services, Inc. ("Aventura"), Scott Tinkler ("Tinkler"), Neil Goodman ("Goodman"), and Ron Sorci ("Sorci"), alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA").   Defendants now ask the Court to disqualify Celler, Schulman, and Morgan & Morgan.   The parties have submitted abundant briefing and evidence to the Court on the Motion to Disqualify Celler and Motion to Disqualify

---

[1]  Schulman filed a Notice of Appearance [ECF No. 24] on January 26, 2012.  Angeli Murthy ("Murthy") filed a Notice of Appearance [ECF No. 76] as counsel for Plaintiff on March 9, 2012.  Celler, Schulman, and Murthy are all attorneys at Morgan & Morgan.

Morgan & Morgan (collectively, "Motions").[2]  The Court has carefully reviewed the Motions, the parties' submissions, the record, and the applicable law.

## I.    LEGAL STANDARD

Under Florida law, "[a]n order involving the disqualification of counsel must be tested against the standards imposed by the Rules of Professional Conduct."  *Morse v. Clark*, 890 So. 2d 496, 497 (Fla. 5th DCA 2004) (citing *City of Lauderdale Lakes v. Enter. Leasing Co.*, 654 So. 2d 645 (Fla. 4th DCA 1995); *Cazares v. Church of Scientology of Cal., Inc.*, 429 So. 2d 348 (Fla. 5th DCA 1983)).  "The party moving to disqualify counsel bears the burden of proving the grounds for disqualification."  *Armor Screen Corp. v. Storm Catcher, Inc.*, 709 F. Supp. 2d 1309, 1310 (S.D. Fla. 2010) (citing *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003)).  Faced with a motion to disqualify, a court must "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely choose counsel."

---

[2]  Defendants filed a Supplement ("First Supplement") [ECF No. 83] to the Motion to Disqualify Celler on March 9, 2012.  Plaintiff filed an Omnibus Response to Defendants' Motions to Disqualify ("Response") [ECF No. 99] on March 16, 2012, to which Defendants replied ("Reply") [ECF No. 123] on April 3, 2012.  The Court held an evidentiary hearing on the Motions, and on Plaintiff's own motion to disqualify Defendants' counsel [ECF No. 35], on March 13, 20, and 26, and April 2, 2012.  (*See* [ECF Nos. 94, 102, 111, 117]).  After the hearing, on April 3, 2012, Plaintiff filed a Post-Hearing Brief on Defendants' Motions to Disqualify ("Plaintiff's Post-Hearing Brief") [ECF No. 127].  Defendants filed a Memorandum in Support . . . ("Defendants' Post-Hearing Brief") [ECF No. 128] on April 4, 2012.  Defendants further filed a Second Supplement ("Second Supplement") [ECF No. 137] to the Motions on April 16, 2012.  Plaintiff filed a Response to Defendants' Second Supplement . . . ("Response to Second Supplement") [ECF No. 138] on April 16, 2012, to which Defendants filed a Reply ("Second Supplement Reply") [ECF No. 139] on April 18, 2012.  Defendants filed, under seal, a Third Supplement ("Third Supplement") [ECF No. 142] to the Motions on April 23, 2012.  Plaintiff filed a Response to Defendants' Third Supplement . . . ("Response to Third Suplement") [ECF No. 147] on April 27, 2012, also under seal.  Defendants filed a Reply to Plaintiff's Response to Defendant's [sic] Third Supplement . . . ("Third Supplement Reply") [ECF No. 169], on May 14, 2012.

Defendants filed the Third Supplement under seal in order to protect the confidentiality of documents generated in ongoing arbitration proceedings.  (*See* [ECF No. 141]).  The Court will discuss the Third Supplement, Response, and Reply thereto where necessary, without discussing the content of the arbitration documents in question.

*Woods v. Covington Cnty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976). "Disqualification of one's chosen counsel is a drastic remedy that should be resorted to sparingly." *Armor Screen*, 709 F. Supp. 2d at 1310 (citing *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982)). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if compelling reasons exist." *BellSouth*, 334 F.3d at 961 (internal quotation marks and citations omitted). Furthermore, "[s]uch motions are generally viewed with skepticism because . . . they are often interposed for tactical purposes." *Yang Enters., Inc. v. Georgalis*, 988 So. 2d 1180, 1183 (Fla. 1st DCA 2008) (internal quotation marks, brackets, and citations omitted).

## II.     ANALYSIS

Defendants state that since filing this action, Celler "has systematically engaged in inappropriate and offensive behavior," including violations of the Florida Bar Rules of Professional Conduct ("Florida Bar Rule[s]") 4-1.6, 4-4.2, 4-4.4, and 4-8.4. (Mot. to Disqualify Celler 1). Defendants further argue that Schulman and the entire firm of Morgan & Morgan must be disqualified on the additional basis of a violation of Florida Bar Rule 4-7.4. (Mot. to Disqualify Morgan & Morgan 8). Defendants' arguments for the disqualification of Schulman and Morgan & Morgan largely mirror those for Celler's disqualification, with few exceptions. Defendants contend that Schulman is Celler's "underling, and takes all of her orders from him." (Mot. to Disqualify Morgan & Morgan 1). Defendants state:

> [W]hile much of [the Motion to Disqualify Morgan & Morgan] concerns Celler's actions (though Schulman is copied or a recipient of many of the e-mails), because his actions as managing partner bind the firm, Ms. Schulman and the firm should be disqualified, so as the [Motion to Disqualify Morgan & Morgan] is read [sic], "Celler" should be interpreted to mean Celler, Schulman, and Morgan & Morgan, P.A.

(*Id.* 2). Needless to say, the Court will not adopt this perplexing shorthand, which Defendants

themselves apply less-than-consistently throughout their briefs on this matter.  Rather, the Court shall attempt to discuss Celler, Schulman, and Morgan & Morgan separately, with respect to each purported basis for disqualification.  The Court shall refer to "Plaintiff's counsel" where this distinction is not necessary.  The Court addresses the parties' arguments on each basis for disqualification in turn, and first determines whether the various Florida Bar Rules invoked have been violated.  The Court then turns to the separate issue of whether these violations merit disqualification, and of whom.

### A.  Florida Bar Rule 4-4.2

Defendants contend Plaintiff's counsel should be disqualified due to *ex parte* communications with multiple individuals in violation of Florida Bar Rule 4-4.2, which provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. . . .

FLA. BAR R. PROF'L CONDUCT 4-4.2(a).  The Court examines the parties' arguments regarding each individual with whom Plaintiff's counsel allegedly had an *ex parte* communication.

### 1.  *Padurjan*

Defendants contend Celler violated Florida Bar Rule 4-4.2 when he communicated with Sasa Padurjan ("Padurjan") regarding the latter's prior cases against Aventura in this District.[3] (*See* Mot. to Disqualify Celler 9).  According to Defendants, Defendants' former counsel, Chris Kleppin ("Kleppin"),[4] represented Padurjan in these previous matters, "and therefore Kleppin and Padurjan enjoy an ongoing attorney-client relationship *with respect to the matter*," with

---

[3]  These are case numbers 1:07-cv-21650 and 1:08-cv-20128 ("*Padurjan* Actions").

[4]  The Court granted Plaintiff's motion to disqualify Kleppin and his firm, Glasser, Boreth & Kleppin, P.A., on April 30, 2012.  (*See* Apr. 30, 2012 Order [ECF No. 150]).

activity in one of Padurjan's cases as recently as September 2011.  (*Id.* & 3) (emphasis added).

Defendants further assert that "the way in which Celler did it is particularly reprehensible,

because he invaded the attorney-client relationship Kleppin enjoyed with Padurjan solely in

order to manufacture an argument to attempt to get Kleppin disqualified — by soliciting

Padurjan to become a witness by falsely suggesting to Padurjan that he may have some claim

against Aventura."  (*Id.* 10).  Plaintiff has submitted an affidavit that Plaintiff's counsel had

Padurjan sign ("Padurjan Affidavit") [ECF No. 99-2].  According to Defendants, the content of

the Padurjan Affidavit itself is proof that Celler violated the attorney-client relationship between

Kleppin and Padurjan.  (*See* Mot. to Disqualify Celler 10).

Plaintiff states Padurjan reached out to Morgan & Morgan, not the other way around.

(*See* Resp. 4).  Plaintiff contends the attorney-client relationship between Padurjan and Kleppin

is not ongoing, and the Padurjan Affidavit states Padurjan was not represented by counsel when

Padurjan contacted Morgan & Morgan.  (*See id.*).  Plaintiff further cites an email communication

by Padurjan showing that he did not consider himself Kleppin's client.  (*See id.* 5 (citing Mar. 4,

2012 Email Exchange, Resp. Ex. 3 [ECF No. 99-3])).  In this email exchange, Schulman writes

to Padurjan, in part:

> Just to be clear, is Chris Kleppin still your attorney?  He's recently
> referred to you as both a current client and a former client in his efforts to stay on
> the Aventura cases but what really controls is what you believe the relationship to
> be.  When you contacted us a few weeks ago, it seemed apparent to me that you
> were not Kleppin's client nor had you been for awhile but — to be safe — I
> wanted to verify that I was not making an incorrect assumption.  Please confirm.

(Mar. 4, 2012 Email Exchange).  Padurjan replied, "He is NOT my attorney."  (*Id.*).

The parties, as well as Padurjan, have all taken the position that Padurjan is no longer

Kleppin's client.  The Court understands Defendants now to argue that while the relationship no

longer continues, there are certain attorney-client privileges attaching to Kleppin's previous

representation of Padurjan.  This was the basis for the Court's finding that Kleppin had an impermissible conflict of interest in representing Defendants in this case, which is substantially related to Padurjan's matter.  (*See* Apr. 30, 2012 Order 16).[5]  However, all parties and Padurjan agree that Padurjan is currently an unrepresented third party in this action.

Since Padurjan is not "represented by another lawyer in the matter," Florida Bar Rule 4-4.2(a) does not apply to Plaintiff's counsel's contact with him.  FLA. BAR R. PROF'L CONDUCT 4-4.2(a).  Rather, potentially more relevant is Florida Bar Rule 4-4.4, which states, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person."  FLA. BAR R. PROF'L CONDUCT 4-4.4(a).  Thus, lawyers are subject to "legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."  *Id.* cmt.  Defendants, however, have not identified any legal rights of Padurjan that were violated by Plaintiff's counsel's contact, since Padurjan was no longer Kleppin's client.

Defendants cite a Florida Professional Ethics Committee opinion from 1965 as evidence that Canon 9 of the former Canons of Professional Ethics forbids Plaintiff's counsel's contact with Padurjan.  (*See* Mot. to Disqualify Celler 9–10; Ethics Opinion, Mot. to Disqualify Celler Ex. 5 [ECF No. 47-5]).  The Court will not disqualify anyone on the basis of Canon 9, unless a specific violation of the Florida Bar Rules is identified.  *See Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 755 (11th Cir. 2006) (stating that "in deciding whether to grant the motion to

---

[5]  With respect to Padurjan, Defendants appear largely to take issue with supposed machinations on the part of Plaintiff's counsel to manufacture a conflict of interest to disqualify Kleppin.  The Court thoroughly addressed these issues in the April 30, 2012 Order, and found certain of Plaintiff's counsel's complaints regarding the conflict of interest to be legitimate.  The Court does not consider the arguments successfully raised by Plaintiff's counsel and addressed in the April 30, 2012 Order as grounds for Plaintiff's counsel's disqualification.

disqualify it [is] required to identify a specific rule of professional conduct applicable to that court and determine whether the attorney violated that rule" and holding Canon 9 is no longer the applicable standard).[6]  Defendants have not otherwise identified an applicable Florida Bar Rule other than 4-4.2, which does not apply here, that would bar the mere fact of Plaintiff's counsel's contact with Padurjan.[7]  Accordingly, the Court does not grant the Motions on this basis, but notes that other potential issues have been raised with respect to the content of the Padurjan Affidavit itself, which are addressed *infra*.

### 2.    *Tinkler*

Defendants also contend Celler had an inappropriate *ex parte* communication with Defendant Tinkler, an officer of Defendant Aventura.  The substance of these troubling allegations is, for the most part, set forth in emails and affidavits and is undisputed by the parties. This communication took place in the context of a case brought against Defendants by another individual driver, Rodney Schatt ("Schatt"), in *Schatt v. Aventura Limousine & Transp. Serv. Inc.*, No. 10-22353-CIV-COOKE ("*Schatt* Action").  Defendants nevertheless argue that the purported communication applies equally to other FLSA actions in which Plaintiff's counsel is acting against Defendants, including the present action.  (*See* Reply 3).

Tinkler testified before the undersigned that during an arbitration hearing in the *Schatt* Action, he was walking through a common area to the bathroom on a break in his testimony.  He

---

[6]  In any event, the cited opinion merely states that a party's attorney may not communicate directly with the opposing party on the subject of the litigation, in view of settlement of the judgment, until that attorney has determined the opposing party is no longer represented by counsel.  Here, there is no dispute Padurjan was no longer represented by counsel.

[7]  Defendants also argue that Celler improperly "induced" Padurjan to sign the affidavit by suggesting that Padurjan could join this action.  (Mot. to Disqualify Celler 11).  Padurjan, however, flatly denied any such inducement at the evidentiary hearing; he testified he did not even remember reading the portion of his affidavit stating that he wished to participate in this action.  As there is no evidence that any inducement occurred, the Court does not accord this argument much weight.

stated:

> Mr. Celler approached me from the rear. . . .  He said, Scott, you are a big
> firm and you can afford better representation than Mr. Coupal and that he could
> never settle with him, and I walked away.

(Apr. 2, 2012 Hearing Tr. 4:16–21 [ECF No. 118]).  Celler has submitted a signed affidavit

("Celler Affidavit") [ECF No. 99-4] giving his own account of his contact with Tinkler.  Celler

avers that throughout the *Schatt* Action he had frequent, even daily, casual contact with Tinkler,

and they "chatted about personal matters, offered to buy each other coffee or snacks, and

repeatedly remarked how much [they] actually enjoyed speaking and how awkward it was to be

litigating against each other."  (Celler Aff. ¶ 6).  With respect to the specific conversation at

issue, Celler states:

> During one of the aforementioned breaks in arbitration, Scott Tinkler and I
> were in the open lobby of the American Arbitration Association.   The
> Association's doors were pried open to the outside hallways where Mr. Coupal,
> Mr. Sorci, and Mr. Goodman were waiting to use the bathroom.   While Mr.
> Tinkler and I were chatting, I specifically said to him: "Dude, you guys are a big
> company.  You need to have outside counsel who specializes in this stuff."  Mr.
> Tinkler responded to me as follows: "I know.  We are looking into it."

(*Id.* ¶ 7).  According to Celler, the exchange "lasted no more than 10 seconds."  (*Id.*).

There is some dispute between the parties as to whether the statement was truly *ex parte*.

Plaintiff argues "it was a ten-second exchange, during a break in the proceedings, which

occurred in the open and within view of Mr. Coupal."  (Resp. 6).  The evidence, however,

establishes otherwise.  Celler wrote Coupal the following:

> Jason,
>
> I have reviewed the email correspondence between you and Stacey over
> the last few weeks.  No wonder you begged her not to have me on the next trial.
> It is apparent that your MO is trying to purposefully delay things as much as
> possible.  This is because it appears (from what I observed at trial), you are not a
> trial lawyer.  If you want to play in the sand box with trial lawyers, you are going

to do it the right way or we are going to call you out to the judge — every time. . . .

> *We are not interested, nor are our clients, in settlement discussions with you as long as you are the lawyer on the other side. You are causing your client a great disservice. If you were not on the other side of the table, we would have a better chance of any resolution and would sit with the principals of the company. I have told Scott Tinkler this.*

> . . . Time to put your boots on and get to work. No more whining, no more complaining about how you have no support staff, no more complaining about how much work you have to do. Nobody on this side of the internet cares. . . .

(Jan. 30, 2012 Email Exchange, Mot. to Disqualify Celler Ex. 1 [ECF No. 47-1]) (emphasis added). Coupal responded that if Celler had spoken to Tinkler without his consent, Celler had done so in violation of the Florida Bar Rules. (*See id.*). Celler wrote back:

> Yeah. *Scott approached me during the hearing and we talked about it*. If you feel a bar greivance [sic] is appropriate considering the fact that your clients have emailed me after I advised them to go through you, then do what you have to do.[8] I have the writings to back up my position. *Just to be clear in the future, tell your clients that we are willing to negotiate with them as long as you are not involved*. You are an impediment to all of these proceedings. It's a shame.

(*Id.*) (emphasis added). The email exchange between Celler and Coupal demonstrates Coupal was not previously aware of the communication to Tinkler, a fact that even Celler's own affidavit conclusively confirms. Celler declares, "it appears Mr. Tinkler thought so little of our exchange in the lobby regarding bringing in outside counsel, that he never even reported it to Mr. Coupal. It was not until two (2) weeks later when I mentioned it to Mr. Coupal that he had to reach out to investigate this communication and actually ask Mr. Tinkler whether the communication actually took place." (Celler Aff. ¶ 11).

When asked what effect Celler's statements had on him, Tinkler said

> Well, at the immediate time it cause me so much nauseam [sic] that I went and vomited in the bathroom because I was on the stand. I was extremely

---

[8] Celler is referring to a separate email exchange he had with Goodman, discussed below.

intimidated by this whole process.  I don't know where that came from.  I went and told Mr. Goodman and Mr. Sorci immediately after what had occurred and it was completely — it put me in a lot of distress based on the fact that I was testifying and from that point on, I don't know if I was as effective as I would have been if I hadn't been given that information.

(Apr. 2, 2012 Hearing Tr. 4:24–5:7).  Tinkler further testified:

> Q: Has this ex parte communication negatively impacted your relationship with Mr. Coupal at all?
>
> A: Yes, it has. . . .  When Mr. Coupal came to me regarding the communication, he was extremely upset and he asked me if Mr. Celler has said anything to me about him, and I said yes, and I basically explained exactly what he said. . . .
>
> Q: How was it effected your relationship Mr. Coupal? [sic]
>
> A: It has put a lot of pressure on it.  There is a lot of tension between us now.  It has caused a lot of angst between Mr. Coupal and I and I don't know if it is reparable.

(*Id.* 8:19–22).    Sorci corroborated Tinkler's testimony and the content of Celler's communication.  (*See id.* 79:4–9).

Plaintiff contends that since it occurred in the context of the *Schatt* Action, Celler's statement has "absolutely nothing to do with this case."  (Pl.'s Post-Hearing Br. 6).  Where "conduct [is] neither before the district court nor in direct defiance of its orders, the conduct is beyond the reach of the court's inherent authority to sanction."  *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 461 (5th Cir. 2010) (finding district court lacked authority to sanction conduct in connection with court-ordered arbitration); *see also Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 345 (2d Cir. 1986) ("Violations of orders in other litigation should not be the basis for an award in the instant litigation; such violations are best dealt with in the actions in which they have occurred.").

Celler's statement to Tinkler admittedly occurred in connection with another forum —

court-ordered arbitration in another case. While conduct in another forum may not be sanctionable by the Court, the Court may look to such conduct, where relevant, as evidence in determining whether conduct properly before the Court is sanctionable. *See In re Lawrence*, No. 97-14687-BKC-AJC, 2000 WL 33950028, at *5 & n.8 (Bankr. S.D. Fla. June 2, 2000) (holding that trustee could not seek sanctions for conduct during appeal in different forum, but that such conduct was relevant evidence to document issue of "course of bad faith conduct" before the court) (citing FED. R. EVID. 401).

There is little doubt that Celler's ill-advised statement to Tinkler has had a clear and discernible *effect* on the present action. Indeed, an all-encompassing statement that Defendant Aventura "can afford better representation than Mr. Coupal and that [Celler] could never settle with him" must have had an effect on this case, in which Coupal continues to represent Aventura. Tinkler made clear in his testimony that the *ex parte* communication affects his relationship with Coupal in general, including with respect to this action. There is moreover credible evidence Celler has not acted in good faith to settle with Coupal in the present action, a further indication that the scope of Celler's statement extended beyond the *Schatt* Action.[9] (Apr. 2, 2012 Hearing Tr. 4:16–21 [ECF No. 118]).

The Court finds that although the specific statement at issue did not occur in proceedings

---

[9] Plaintiff attempts to argue that Celler could not have refused to settle with Coupal, since after the *ex parte* communication Celler made a "good faith settlement offer" to Coupal of $7.5 million, as a common fund for the various claims against Defendants. (Pl.'s Post-Hearing Br. 12). As an initial matter, the Court notes that the fact Celler offered a single figure to settle various plaintiffs' claims further demonstrates that Celler's statement applied to several cases, not just the *Schatt* Action. With respect to whether this was a good faith offer, Defendants have made clear such an offer seemed excessive in the extreme, and "[i]t made [Tinkler] feel sick to [his] stomach." (Apr. 2, 2012 Hearing Tr. 20:8). Plaintiff's justification for the number, that "each plaintiff's claimed unpaid wages need only be $35,000.00 in order to reach the proposed settlement amount" (Pl.'s Post-Hearing Br. 12 n.12), strikes the Court as flimsy, particularly as Defendants give several compelling reasons that Plaintiff never rebuts as to why the settlement amount would not have been permitted by law (*see* Reply 23). Without making a determination as to the plausibility of Plaintiff's settlement offer, the Court finds it does little to prove Celler made no such statement that he would not settle with Coupal, particularly given the clear documentary evidence showing otherwise.

before the undersigned, that statement has so affected the administration of the current action that a remedy is warranted. "It is a given that federal courts enjoy a zone of implied power incident to their judicial duty." *NASCO, Inc. v. Calcasieu Television & Radio, Inc*., 894 F.2d 696, 702 (5th Cir. 1990) *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). The Court's inherent power is "an implied power squeezed from the need to make the court function. It is power *necessary* to the exercise of all others . . . and governed not by rule or statute but by the control *necessarily* vested in courts to manage their own affairs." *Id.* (internal quotation marks and citations omitted) (emphasis in original).

In particular, the Court is deeply troubled by Celler's *ex parte* statement to Tinkler that Celler would never settle with Defendants as long as they were represented by Coupal. The fact that Celler then made a questionable settlement offer to Defendants in this action strongly suggests the statement applied equally to this action as to the *Schatt* Action. Such a statement so profoundly undermines the client-attorney relationship between Defendants and Coupal in this action, as well as the effective administration of this action, that the Court cannot turn a blind eye to it. Thus, the Court will not refuse to sanction Celler's *ex parte* conduct with Tinkler on the basis that it occurred in another forum. For all intents and purposes, Celler's statement is conduct before the Court, and the Court is empowered to grant relief to the extent necessary to protect the integrity of proceedings before it.

Plaintiff further contends it is "strange" Defendants did not mention the conduct to the arbitrator in *Schatt* immediately. (Pl.'s Post-Hearing Br. 11). Tinkler gave ample explanation as to why he did not initially report Celler's *ex parte* statement to Coupal. Tinkler emphasized that this was not "a casual exchange" (Apr. 2, 2012 Hearing Tr. 5:14–15), and he was put in a challenging position since he "didn't want to subject Jason [Coupal] to any unneeded distress"

given serious health issues Coupal was experiencing (*id.* 5:19–22).  Tinkler stated:

> [I]t put me in a no-win situation and I didn't know what to do and the fact
> that I never told Jason caused me even more angst because I had to live with what
> was said and internalize it, so I never disclosed it to Mr. Coupal.

(*Id.* 5:24–6:2).  Tinkler clarified that he "never told Mr. Coupal about it until [Coupal] came to

[him] with Mr. Celler's email about it."  (*Id.* 26:8–9).  Tinkler stated that he had witnessed Celler

"berat[ing]" Coupal throughout the proceedings.  (*Id.* 6:7–8).  Sorci confirmed that he and

Tinkler were concerned about telling Coupal what had occurred, due to Coupal's health and the

timing.  (*See id.* 79:12–20).  Indeed, the very nature of Celler's statement was to weaken

Defendants' confidence in their attorney.  The Court finds it unsurprising that this affected

Defendants' ability to subsequently confide in Coupal.

Plaintiff makes other arguments, none of which are relevant to the issue at hand.[10]  The

Court will, however, specifically address Plaintiff's contention that Defendants' portrayal of

Celler's character is "inconsistent" with another *ex parte* communication Celler had with

Defendant Goodman.  (Pl.'s Post-Hearing Br. 11).  Plaintiff avers that in a previous instance in

which a Defendant attempted to contact Celler *ex parte* on a matter of substance, "Mr. Celler

recognized his obligations and insured that the contact was reported to opposing counsel."

(Resp. 6 (citing Nov. 16, 2011 Email Exchange, Resp. Ex. 5 [ECF No. 99-5])).  In the email

correspondence Plaintiff cites, Goodman wrote to Celler:

> Just want to tell you that I appreciate all that you are trying to help with . .
> . and understand the obstacles involved . . . I in turn will try and persuade the
> team to make as many concessions as possible, without having a "mutiny" on our
> hands . . . Thanks Richard . . . this difficult [sic] because you're the type guy I

---

[10]  These include assertions that the parties actually had a "pleasant" relationship during the *Schatt* Action,
Tinkler's wife donated to a charity in which Schulman was participating, the topic of whether Defendants
would need outside counsel due to Coupal's health (not his competence) was mentioned in front of the
arbitrator, and Defendants had begun talking with Kleppin as early as December 2011.  (Pl.'s Post-
Hearing Br. 11).  None of these address whether an *ex parte* communication within the meaning of
Florida Bar Rule 4-4.2 occurred.

> could have a beer with, but I know business is business . . . Please keep this
> confidential, thank you

(Nov. 16, 2011 Email Exchange) (ellipses in original).  No one else was included as a recipient

of this message.  Celler replied, solely to Goodman:

> I will and I appreciate the note.  Honestly, I make enough money.  I'm
> losing money on this file.  *This one is more of a favor for Rod and to get you two*
> *guys to bury the hatchet.  He is hurt deep down which I think is the ultimate*
> *driving motive.*  I'm not allowed to email you directly because you are represented
> so if you could just let Jason [Coupal] know we emailed that would be
> appreciated.  I don't want to violate ethics rules and don't want to burn a
> professional bridge by having him think I am going behind his back.  Don't let the
> shorts and sneakers fool you :)

(*Id.*) (emphasis added).[11]  In the first instance, whether or not Celler's *ex parte* communication

with Tinkler occurred is beyond dispute, and any communication with Goodman cannot negate

this fact.  Moreover, the Court finds it all the more remarkable Celler would point to this

exchange with Goodman as corroboration of Celler's character, when Celler's response to

Goodman does not copy Goodman's attorney and actually contains remarks pertaining to the

substance of that case, *i.e.*, his client's motives.[12]  In any event, Celler's email to Goodman fails

to controvert the established fact of Celler's improper communication with Tinkler.

The Court finds that Celler's *ex parte* communication with Tinkler violated Florida Bar

Rule 4-4.2.  Rule 4-4.4 is also implicated, as Celler "use[d] means that have no substantial

purpose other than to embarrass . . . or burden" Defendants and Coupal, FLA. BAR R. PROF'L

CONDUCT 4-4.4(a), and made an "unwarranted intrusion[] into [a] privileged relationship[]," *id.*

cmt.

---

[11]  Testimony during the evidentiary hearing before the Court revealed that Celler was in the habit of
wearing shorts and sneakers to proceedings during the *Schatt* Action, including depositions.  (*See* Apr. 2,
2012 Hearing 17:11–15).  This misconduct is discussed below in reference to Florida Bar Rule 4-8.4.

[12]  This is especially true since Defendants have attempted to seize on Celler's statement that Schatt was
"hurt deep down" as proof of Schatt's motive in allegedly soliciting clients for Morgan & Morgan, as
discussed below.  (*See* Reply).

3. *Goetz*

According to Defendants, Schulman telephoned "former manager and current worker for Aventura," Michael Goetz ("Goetz"), and "told him that he needed to come to her office for a 'deposition.'" (Mot. to Disqualify Morgan & Morgan 9). When Goetz arrived at Schulman's office, no deposition was held; rather, Schulman purportedly discussed the substance of this action with him and "goaded him into signing an affidavit that was not true." (*Id.*). As with Tinkler, the substance of Plaintiff's counsel's contact with Goetz is virtually undisputed. The issue is whether the contact violates Florida Bar Rule 4-4.2.

Goetz testified that he was a director of training for Aventura from 2002 to 2009. (*See* Mar. 13, 2012 Hearing Tr. [ECF No. 100] 22:4–11). He has not been a manager at Aventura since 2009. (*See id.* 29:25–30:5). The only service he currently provides Aventura is as an independent contractor operating as a "greeter at the airport." (*Id.* 30:6–12). He considers himself retired and free to work for Aventura or anyone else when he wants. (*See id.* 30:13–18). He was providing these greeting services for Aventura when Plaintiff's counsel contacted him to come to her office for a deposition. (*See id.* 24:8–10). Goetz received a letter in December 2011 or January 2012 from Morgan & Morgan, as well as a follow-up phone call from Schulman. (*See id.* 24:12–22).

Goetz testified that when he arrived at Morgan & Morgan, he met with both Schulman and Celler, as well as Schatt. (*See id.* 27:5–9; 32:1–3). He was told they wished to speak to him about a deposition, but they "actually gave [him] an affidavit and asked if [he] would sign that." (*Id.* 25:14–19). He "[w]ent through the affidavit and they went through the whole testimony that they were asking." (*Id.* 25:24–25). Goetz told Schulman and Celler what his role at Aventura was at that point. (*See id.* 28:7–9). Goetz was never told by Schulman or Celler to speak to

someone at Aventura before signing the affidavit. (*See id.* 29:1–3). Goetz further testified that when he came in for this meeting, he was not represented by counsel at the time. (*See id.* 31:15–17). During Schulman's cross-examination of Goetz, the following exchange occurred:

> Q: . . . And the three of us sat in the office and you talked to us about what you would do with the training at Aventura?
>
> A: Yes.
>
> Q: You talked to us about the different manuals and things like that that were used during training?
>
> A: Yes.
>
> Q: Did anybody use the word "deposition" at that time?
>
> A: Yes.
>
> Q: Okay. In fact, we said this was instead of you having to do a deposition. You could come in and just talk to us and we could memorialize it in the form of an affidavit?
>
> A: Correct.

(*Id.* 32:3–14). Goetz went to Morgan & Morgan's office more than once in order to review and sign the affidavit with Celler. (*See id.* 33:1–15). Goetz also did some deposition preparation with Morgan & Morgan while he was there to sign the affidavit. (*See id.* 33:23–34:1). Goetz stated, "I thought I was coming for deposition, but it was [a] voluntary" decision to come to Morgan & Morgan's office. (*Id.* 35:21–22).

After Goetz's meeting at Morgan & Morgan, Coupal wrote to Celler:

> Richard, I understand that you had a meeting with Michael Goetz yesterday, and that you are in the process of "prepping" him for his deposition and/or trial testimony. As Stacey is aware, Mr. Goetz retains ties to this organization, and your "interview" may have run afoul of this company's attorney-client privilege in a number of respects. I would strongly suggest that you refrain from further *ex parte* contact with Mr. Goetz until the arbitrator or another adjudicative body can determine whether your contact with Mr. Goetz was ethically appropriate.

(Nov. 1, 2011 Email Exchange, Reply Ex. 7 [ECF No. 123-7]).  Celler responded,

> You are wrong on all of this.  Goetz is an independent. . . . I will meet with Goetz when I want.  He is not an employee.  He is a former employee.

(*Id.*).

When Coupal indicated he would request a hearing from the *Schatt* arbitrator, Celler stated that Goetz had said he was not represented by Coupal, and that Goetz "said he is retired and not working with you guys." (*Id.*).  Coupal cited case law and a Florida Bar ethics opinion to Celler, stating that Schulman had "conceded in writing" that "Goetz apparently provided services to the company as an independent contractor as recently as two weeks [before]," and Coupal himself had interviewed Goetz in the past on privileged matters.  (*Id.*).  Coupal further stated that "prepping" a non-party witness for deposition without notifying him was ethically suspect.  (*Id.*).  Celler reiterated that Goetz had "confirmed" he was retired and unaffiliated with Aventura.  (*Id.*).  Coupal pointed out that since the "interview" had happened without him or a court reporter present, he was unable to know what Goetz had said or cross-examine him, given his belief Goetz provides services from time to time.  (*Id.*).  From all this, the Court finds Coupal contemporaneously, and thoroughly, raised his concerns to Celler at the time.  Schulman was copied on at least some, if not all, of these emails.

Plaintiff used the affidavit Goetz signed ("Goetz Affidavit") [ECF No. 39-12] in support of Plaintiff's motion for conditional collective action certification.  In his affidavit, Goetz describes his previous work at Aventura as Director of Training, training drivers on Aventura policies and procedures.  (*See* Goetz Aff. ¶¶ 5–6).  Goetz discusses, *inter alia*, the booking practices, compensation, uniform policy, insurance policy, and communication policy applicable to Aventura drivers.  (*See id.* ¶¶ 13–17).  The Court briefly addressed the Goetz Affidavit in the

April 20, 2012 Order denying conditional certification.  (*See* Apr. 10, 2012 Order 10).

Plaintiff offers several reasons why his counsel's contact with Goetz does not constitute *ex parte* contact within the meaning of Florida Bar Rule 4-4.2.  First, Plaintiff suggests the Goetz Affidavit was obtained for the *Schatt* Action and is unrelated to the present case.  (*See* Pl.'s Post-Hearing Br. 6–7).  The fact that Plaintiff used the Goetz Affidavit in the current action, and its obvious relevance to issues in this action with respect to drivers' status as independent contractors or employees, renders this argument unconvincing.  Plaintiff's use of the Goetz Affidavit in this action has brought it within the Court's purview.  Plaintiff further contends, "Mr. Goetz provided only factual information about Defendants' training and policies, and it is undisputed that he did not provide any information to which he did not later testify at deposition." (*Id.* 14).  Whether or not Defendants can prove Goetz provided Plaintiff's counsel with confidential (as opposed to publicly available) information, however, is not relevant to the inquiry under Florida Bar Rule 4-4.2, which forbids *all ex parte* "communicat[ions] about the subject of the representation" without requiring a showing of the confidential nature of those communications.  FLA. BAR R. PROF'L CONDUCT 4-4.2(a).

Plaintiff also asserts that Goetz is not Defendants' counsel's client.  Plaintiff avers Goetz's independent contractor work for Defendants ended "weeks before he met with Plaintiff's counsel."  (Pl.'s Post-Hearing Br. 14).  Plaintiff states that Goetz had to be subpoenaed by Defendants to appear at the evidentiary hearing on the Motions, indicating that Goetz's affiliation with Defendants must be limited.  (*See id.*).

There is no dispute between the parties as to Goetz's current status as an independent contractor performing greeting work for Defendants.  The question is whether Goetz was a client of Defendants' counsel for the purposes of Florida Bar Rule 4-4.2, with respect to issues arising

out of the Goetz Affidavit.  In *Rentclub, Inc. v. Transamerica Rental Finance Corporation*, 811 F. Supp. 651 (M.D. Fla. 1992), a case cited by Defendants and which Plaintiff attempts to distinguish on the facts, the court held:

> An organizational "party" is defined as including: (1) managerial employees, (2) *any other person whose acts or omissions in connection with the matter at issue may be imputed to the corporation for liability*, and (3) persons whose statements constitute admissions by the corporation. . . . While the first and third categories are clearly limited to current employees, several courts and commentators, however, have argued that the second category is broad enough to include *former employees whose acts could result in vicarious liability for the employer*.

*Id*. at 657 (internal citations omitted) (emphasis added).  The court continued:

> [C]ourt authorization or opposing counsel's consent to ex parte contact should be required if the former employee was highly-placed in the company (such as a former officer or director) or *if the former employee's actions are precisely those sought to be imputed to the corporation*.

*Id*. at 657–58 (quoting Samuel R. Miller, *Ex Parte Contact with Employees and Former Employees of a Corporate Adversary: Is It Ethical?*, 42 Bus. Law. 1053, 1072–73 (1987) (emphasis added)).

Plaintiff agrees that "an organizational party is one whose acts or omissions may be imputed to the company for purposes of liability."  (Resp. 5 (citing *Browning v. AT&T Paradyne*, 838 F. Supp. 1564, 1567 (M.D. Fla. 1993); Model Rules of Prof'l Conduct R. 4.2 cmt. (2010)).  Plaintiff argues, however, that nothing in the Goetz Affidavit could impute liability to Defendants.  (*See id.*).  Rather, the affidavit provided factual information on Defendants' training, policies, and procedures, which information was confirmed by other employees of Defendants and is not confidential.  (*See id.*).  Thus, Plaintiff states he employed Goetz as a fact witness, not a managerial employee of Defendants.  (*See id.* (citing *Browning*, 838 F. Supp. at 1567)).

The argument that nothing in the Goetz Affidavit could impute liability to Defendants is

scarcely coherent, given that Plaintiff cited the same affidavit to the Court as proof of Defendants' "misclassification of its drivers," which issue is central to this suit.   (Mot. for Conditional Cert. 10 [ECF No. 39]).   Goetz's actions in allegedly training and imposing Defendants' policies and procedures on Plaintiff "are precisely those sought to be imputed to" Aventura.  *Rentclub*, 811 F. Supp. at 657–58.  In fact, when asked whether the Goetz Affidavit "provides relevant facts to the factors that make up the economic realities test" used to determine whether an individual is an employee or independent contractor, Schulman replied in the affirmative, "but those are the facts that he provided to us."  (Mar. 20, 2012 Hearing Tr. 8:18– 9:2).  There is moreover every indication that the information Goetz provided Plaintiff's counsel *was* confidential, and no evidence the information was public apart from Plaintiff's counsel's self-serving assertions.

Given the lack of dispute between the parties regarding the applicable rule, the content of the Goetz Affidavit, and the conditions under which it was obtained, the Court cannot but find Celler and Schulman's contact with Goetz violated Florida Bar Rule 4-4.2.

### B.  Florida Bar Rule 4-7.4(a)

Florida Bar Rule 4-7.4(a) provides:

> [A] lawyer shall not solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship, in person or otherwise, when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain.   A lawyer shall not permit employees or agents of the lawyer to solicit on the lawyer's behalf.   A lawyer shall not enter into an agreement for, charge, or collect a fee for professional employment obtained in violation of this rule.   The term "solicit" includes contact in person, by telephone, telegraph, or facsimile, or by other communication directed to a specific recipient . . . .

FLA. BAR R. PROF'L CONDUCT 4-7.4(a).

Defendants assert that Robson Coelho ("Coelho"), the plaintiff in another case, *Coelho v.*

Case No. 11-24432-CIV-ALTONAGA/Simonton

*Aventura Limousine & Transp. Serv., Inc.*, No. 10-23228-CIV-COOKE ("*Coelho* Action"),
testified at a recent deposition that he was solicited by Schatt to call Celler to sue Aventura for
overtime pay.  (*See* Mot. to Disqualify Morgan & Morgan 8 (citing Deposition of Robson
Coelho, Feb. 29, 2012, Mot. to Disqualify Morgan & Morgan Ex. 14 [ECF No. 82-14] ("Coelho
Dep.") 88–90)).  The deposition testimony described reads as follows:

> Q: How did you come to hire your attorney?  Were you recommended by somebody else?
>
> A: Yes.
>
> Q: Who recommended you?
>
> A: Mr. Schatt.  Rod Schatt.
>
> *       *       *
>
> Q: Then later [your action] was as transferred to arbitration.  You are telling me before that Mr. Schatt was the one that recommended you?
>
> A: To the attorney?
>
> Q: Yes.
>
> A: Yes.
>
> Q: Do you know if Mr. Schatt was represented by that firm at the time?
>
> A: He was.
>
> *       *       *
>
> Q: Did — how did you become aware — how did Mr. Schatt make you aware of the firm?
>
> A: It was in a conversation with him, and said, well, give these people a call.  And I called him and asked him to schedule the appointment and come by and talk to them.

(Coelho Dep. 88:23–90:3).

According to Defendants, Celler and Morgan & Morgan have solicited other Aventura

drivers, such as Richard Gillespie ("Gillespie"), to sue for overtime as well.  (*See id.* (citing Affidavit of Richard Gillespie, Mot. to Disqualify Morgan & Morgan Ex. 15 [ECF No. 82-15] ("Gillespie Aff."))).  Gillespie states that Schatt was approached at Miami International Airport by Schatt, who greeted him and asked Gillespie to sit in Schatt's SUV to talk.  (*See* Gillespie Aff. ¶ 3).  At one point in the conversation, Schatt said to Gillespie that he was "not getting paid like [he] should."  (*Id.* ¶ 5).  Schatt informed Gillespie that "a group of drivers had gotten together and hired 'the best lawyer in the business' to sue Aventura, and that [Gillespie] should contact this lawyer which he could arrange."  (*Id.*).  Schatt pressed Gillespie for the latter's telephone number, which Gillespie ultimately provided Schatt.  (*See id.*).  Schatt also gave Gillespie Schatt's number in case Gillespie "wanted to ask him questions about suing Aventura." (*Id.*).  Gillespie stated, "It was my impression that I was being recruited to sue Aventura for some sort of pay issue and that my number was being taken for the purpose of getting me involved in it, so I would inquire further.  Mr. Schatt never asked me to be a witness in his suit, or to join his suit." (*Id.* ¶ 6).  Defendants state their belief that Schatt was soliciting individuals to join this case.  (*See* Reply 3).  Defendants aver that Celler's statement that Schatt was "hurt deep down" (Nov. 16, 2011 Email Exchange) demonstrates that Celler's true motive in asking how employee drivers were paid during settlement negotiations in the *Schatt* Action was to bring other lawsuits against Aventura, not settle.  (*See* Reply 7).

Defendants assert that Padurjan also was solicited, as is shown by the Padurjan Affidavit. (*See id.* 4).  Defendants state that one can infer Schatt contacted Padurjan on Celler's orders. (*See id.*).

Defendants contend "the totality of the circumstances" make it apparent Plaintiff's counsel used Schatt as an agent to solicit drivers.  (*Id.* 7).  Defendants alternatively raise the

possibility that even if Plaintiff's counsel did not actively employ Schatt as an agent, they passively allowed him to solicit on their behalf. (*See id.* 8). Defendants go so far as to say that Celler and Morgan & Morgan should have refused to represent clients referred by Schatt. (*See id.* 8–9).

Plaintiff states that "Defendants have not produced one iota of evidence to indicate that **anyone** at Morgan & Morgan, P.A. has ever reached out to potential clients in any matter relating to Defendants, or that any of the clients in this matter were solicited in any manner." (Resp. 2) (emphasis in original).

Plaintiff is correct that there is no evidence Celler, Schulman, or Morgan & Morgan solicited Coelho, Gillespie, or Padurjan against Aventura. Schatt testified:

> If someone asks me how do I further my interests in what is going on, could I be involved, if they ask me these questions, I guess it is like if I had a good plumber. If I had a good plumber and someone asked me how to fix something, I would recommend then. Yeah, I would recommend this law firm.

(Mar. 20, 2012 Hearing Tr. 89:10–14). When Coupal asked Schatt what interest he had in getting other drivers to file suit against Aventura, Schatt stated, "I have no interest. I'm getting nothing out of this." (*Id.* 90:7). Schatt flatly denied that he received any favor from Celler for referring clients. (*See id.* 94:25–95:5). In fact, Schatt testified Morgan & Morgan "told [him] not to go solicit anybody." (*Id.* 96:15). Defendants did not elicit any information during the evidentiary hearing before the Court, or furnish any evidence in the record, that Morgan & Morgan solicited clients to act against Aventura through Schatt. While Defendants ask the Court to infer from "the totality of the circumstances" that Schatt must have been motivated to solicit on Morgan & Morgan's behalf, and therefore must have done so, another explanation is just as, if not more, likely — that Schatt is simply telling the truth. The Court does not find Schatt's contacts with other drivers constitute a violation of the Florida Bar Rules.

Nevertheless, Defendants complain that Morgan & Morgan registered a website with the uniform resource locator http://www.aventuralimodriverovertimelawsuit.com ("Overtime Website"), on April 5, 2012.  (Second Supp. 2).  Defendants provide a copy of a screen shot of the Overtime Website as of April 16, 2012, displaying contact information for Celler, Schulman, and Morgan & Morgan, and advising, "If you have any questions about the Aventura Overtime Lawsuit, or overtime pay issues with any employer or past employer," to contact Morgan & Morgan.  (Apr. 16, 2012 Screenshot, Second Supp. Ex. 1 [ECF No. 137-1]).  Defendants contend the Overtime Website violates Florida Bar Rules 4-7.4 and 4-7.6 by soliciting clients to join this action; Defendants assert this violation is all the more egregious since the Court denied Plaintiff's motion for conditional collective action certification on April 10, 2012.  (*See* Second Supp. 2).

Defendants further advise that the Overtime Website has been revised since the Second Supplement was filed.  (*See* Revised Screenshot, Second Supp. Reply Ex. 1 [ECF No. 139-1]). The revised text of the Overtime Website contains the same information as on the original version, but adds, *inter alia*:

> If you or someone you know worked as a chauffer/driver for Aventura Limo, you/they may be entitled to additional overtime pay in the weeks in which you/they worked in excess of 40 hours
>
> Aventura Limo may have illegally miscalculated your overtime payrate. As a current or former chauffer/driver of Aventura Limo, you, or others you know, may be eligible to make a claim for corrective overtime pay.
>
> If you or anyone you know would like more information about the case against Aventura Limo, please contact . . .

(*Id.*).  The Overtime Website also posts a link to the interim award on liability issued in the *Schatt* arbitration.  (*See id.*).  According to Defendants, "Plaintiff's counsel are attempting to perform an 'end run' around the Court's Order [denying conditional certification] by soliciting

the representation of the same potential plaintiffs who would have been noticed had the Court conditionally certified a collection action." (Second Supp. Reply 2). Defendants assert the "implication" of the Overtime Website is clear that drivers are encouraged to contact Morgan & Morgan under the guise that they will join a unitary case against Aventura; instead, the drivers will be signed on for individual cases. (*Id.* 2–3). Defendants accuse Plaintiff's counsel of "stirring up" litigation through unwarranted solicitation. (*Id.* 3).

> With respect to advertisements on lawyer websites, Florida Bar Rule 4-7.6(b) provides:

>> All World Wide Web sites and home pages accessed via the Internet that are controlled or sponsored by a lawyer or law firm and that contain information concerning the lawyer's or law firm's services: (1) shall disclose all jurisdictions in which the lawyer or members of the law firm are licensed to practice law; (2) shall disclose 1 or more bona fide office locations of the lawyer or law firm, in accordance with subdivision (a)(2) of rule 4-7.2; and (3) *are considered to be information provided upon request.*

FLA. BAR R. PROF'L CONDUCT 4-7.6(b) (emphasis added). "[A] lawyer's Internet web site is accessed by the viewer upon the viewer's initiative and, accordingly, the standards governing such communications correspond to the rules applicable to information provided to a prospective client at the prospective client's request." *Id.* cmt. Thus, such a website does not constitute solicitation as a general rule.

> This language appears squarely to cover the Overtime Website, and Defendants offer no reason why this would not be the case. Their argument with respect to the Order denying conditional certification is unconvincing. Plaintiff did not need to succeed on the motion for conditional certification in order to create a website in compliance with Florida Bar Rule 4-7.6. What success on the motion would have permitted Plaintiff to do would have been to actively provide notice to potential members of the class of the pending suit and an opportunity to opt-in, for example by conducting specific discovery of the names and addresses of employees to send

notice. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169–70 (1989). This is precisely why the first stage of conditional certification is referred to as the "notice stage." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995)). Defendants do not contend Plaintiff specifically sent the Overtime Website link to potential plaintiffs or otherwise sought to give notice of this action to any individual — the only contention is that the Overtime Website is live and searchable by the public as permitted by Florida Bar Rule 4-7.6. The fact that the website refers to "the case" against Aventura Limo does not convert the website into active solicitation. The Court does not find the Overtime Website constitutes an "end run" around the Court's Order and declines to grant the Motions on this basis.

Defendants also accuse Plaintiff of disseminating a web-based "press release" discussing the *Schatt* Action arbitration, which according to Defendants violates the confidentiality of the stayed arbitration proceedings in that case. (Second Supp. Reply 2). Plaintiff argues that there is no applicable rule or agreement calling for the arbitration proceedings in *Schatt* to be confidentifal. (*See* Resp. to Third Supp. 2). Plaintiff cites the Statement of Ethical Principles of the American Arbitration Association ("Statement of Principles") [ECF No. 147-1], for the proposition that details of American Arbitration Association ("AAA") arbitration proceedings may be disclosed unless the parties have a separate confidentiality agreement, which Plaintiff contends does not exist in the *Schatt* Action. (*Id.*). The complete text in question states that AAA proceedings are "a private process," and the AAA "takes no position on whether parties should or should not *agree* to keep the proceeding and award confidential between themselves. The parties always have a right to disclose details of the proceeding, unless they have a separate confidentiality agreement." (Statement of Principles 3) (emphasis added).

Defendants agree that AAA rules govern the *Schatt* arbitration.  As the parties do not dispute that Defendants never agreed to disclose the interim *Schatt* arbitration award, the Court finds Defendants' arguments regarding the press release may have merit.  However, this is not the proper forum for raising a violation of AAA rules in the *Schatt* arbitration.  Moreover, the Court does not find a resulting violation of Florida Bar Rule 4-7.4 with respect to this case, as Defendants still have not demonstrated how Plaintiff's counsel is actively contacting and soliciting clients with the press release — Defendants have only raised objections to the content of the press release itself.  The Court does not grant the Motions to Disqualify on this basis.

### C.  Florida Bar Rules 4-1.6 and 4-4.4(a)

Florida Bar Rule 4-1.6 provides that "[a] lawyer shall not reveal information relating to representation of a client . . . unless the client gives informed consent."  FLA. BAR R. PROF'L CONDUCT 4-1.6.  The purpose of this Rule concerning confidentiality is to engender "trust that is the hallmark of the client-lawyer relationship."  *Id.* cmt.  The Rule "affirmatively restrict[s] attorneys with 'inside' knowledge from using it for the gain of other clients."  *Garfinkel v. Mager*, 57 So. 3d 221, 224 (Fla. 5th DCA 2010) (citing FLA. BAR R. PROF'L CONDUCT 4-1.6) (other citations omitted).

Defendants contend that during a deposition occurring in the context of the *Schatt* Action, Celler and Aventura agreed to engage in confidential settlement negotiations.  (*See* Mot. to Disqualify Celler 12).  As part of those negotiations, Celler induced Aventura to disclose how employee drivers were paid.  (*See id.*).  Defendants state, "[t]he settlement discussions went nowhere, but it is clear that Celler used those discussions as a ruse to find out whether he believed that he could sue Aventura for how it compensated its employee drivers."  (*Id.*).  Soon after, Celler brought the lawsuit *Ceant v. Aventura Limousine & Transp. Serv., Inc.*, No. 12-

20159-CIV-SCOLA ("*Ceant* Action"), in which the plaintiff alleges he was not properly paid as an employee driver under the FLSA.  (*See id.*).  Furthermore, according to Defendants, "[t]he foregoing should also give the Court serious concern that in fact Celler improperly solicited Plaintiff [Bedoya] to file this suit, because of the short timeframe in which it was filed after the information was conveyed in the settlement conference."  (Mot. to Disqualify Morgan & Morgan 16).

Plaintiff argues that these accusations regarding confidential information purportedly disclosed in the *Schatt* Action are irrelevant to the Motion to Disqualify Celler and Motion to Disqualify Morgan & Morgan.  (*See* Pl.'s Post-Hearing Br. 3, 6).  Indeed, the Court finds that Plaintiff's counsel's purported misuse of confidential information obtained in the *Schatt* Action, to bring the *Ceant* Action, is beyond the scope of the issue before the Court in the present action. However, to the extent Defendants contend that the confidential information affected Plaintiff Bedoya's case, the Court examines the parties' arguments and evidence in support.

In the first place, the Court observes that while Defendants invoke Florida Bar Rule 4-1.6, this is not the rule at issue if indeed Plaintiff's counsel divulged Defendants' confidences, for the simple reason that there is no client-lawyer relationship between Plaintiff's counsel and Defendants.  Rather, at issue is Florida Bar Rule 4-4.4, which states, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person."  FLA. BAR R. PROF'L CONDUCT 4-4.4(a).  Thus, lawyers are subject to "legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."  *Id.* cmt.  The Court examines whether Plaintiff's counsel violated this Rule.

The parties do not dispute the fact of the settlement negotiations.  Tinkler gave the following testimony:

> Q: What was your basis for understanding that those discussions were to be kept confidential?
>
> A: It was for the purpose of trying to settle a case.  That was the only reason.  I mean, it was — I told Jason after it happened, Mr. Coupal, I said I was distressed by the entire situation.  I don't understand how you could stop, terminate my deposition, find out how employee chauffeurs are paid, have Mr. Schatt state that he doesn't want to come back as, quote, our employee, and then sue us and then continue the proceedings ten days later.  I was beside myself.  . . . I don't understand how that can be possible.  I don't get it.  It made me lose faith in the system.

(Apr. 2, 2012 Hearing Tr. 15:20–16:8).  Tinkler expressed his understanding that during the confidential settlement discussions, he was still under oath on a break from his deposition.  (*See id.* 48:2–10).  Tinkler declared that Schulman "clearly stated it was for confidential settlement purposes only."  (*Id.* 48:2–3).  Coupal's testimony confirmed Tinkler's testimony regarding what was divulged, and Schulman's statement that the discussions were confidential.  (*See* Mar. 20, 2012 Hearing Tr. 182–83).

Plaintiff, however, states that the specific information Defendants divulged — about how they pay their employee drivers — is not confidential, but "entirely within the public purview," to be found on any of the drivers' pay stubs.  (Resp. 3).  The Court fails to see how information is rendered "public" by being printed on an employee's pay stub, which presumably may contain various personal data that are decidedly *not* public.  Moreover, Plaintiff misses the point.  It is not for the Court to pick through pieces of information divulged during settlement to sort into "confidential" and "not confidential" piles.  Such a task is not only utterly impracticable but is not sanctioned by the law, which evinces a strong policy in favor of the confidentiality of the

medium of the settlement negotiation itself.[13]  Thus,

> [I]t is well established that public policy favors the settlement of disputes and avoidance of court litigation whenever possible.  In fact, in both the state and federal systems, rules have been codified in order to protect and promote this policy.  *See* FED. R. EVID. 408; Fla. Stat. § 90.408; *see, e.g.*, *Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir. 1982) (recognizing a fear that settlement negotiations will be inhibited if parties know that their statements may be used as admissions of liability); *Benoit, Inc. v. Dist. Bd. of Trustees of St. Johns River Cmty. College of Fla.*, 463 So. 2d 1260, 1261 (Fla. 5th DCA 1984) (noting that protecting the offeror furthers the state's public policy favoring settlement).

*Agan v. Katzman & Korr, P.A.*, 328 F. Supp. 2d 1363, 1369 (S.D. Fla. 2004); *see also DR Lakes Inc. v. Brandsmart U.S.A. of W. Palm Beach*, 819 So. 2d 971, 973–74 (Fla. 4th DCA 2002) ("The reason for confidentiality as to statements made during mediation where a settlement agreement is not reached is obvious.  Mediation could not take place if litigants had to worry about admissions . . . being offered into evidence at trial, if a settlement was not reached.").  The negotiations in question took place during court-ordered arbitration.  Plaintiff does not contest this policy in favor of confidentiality during settlement or contend that the policy would not apply during court-ordered arbitration; nor does he deny that Schulman told Tinkler his statements would remain confidential.

Thus, the Court finds that confidential settlement discussions occurred between Defendants and Plaintiff's counsel in the *Schatt* Action, and information divulged during those discussions should be treated as confidential.  The question is whether a Florida Bar rule violation occurred in connection with that information in this case.  According to Defendants, "[t]he foregoing should . . . give the Court serious concern that in fact Celler improperly solicited

---

[13]  Plaintiff makes much of the fact that Defendants purportedly lobbied in Washington, D.C., on the same general issue of how they paid employee drivers, demonstrating that this was public information.  This argument is equally unavailing, as presumably Plaintiff asks the Court to compare individual statements made in Washington, D.C., with statements made during settlement, an unworkable position not supported by the law.

Plaintiff [Bedoya] to file this suit, because of the short timeframe in which it was filed after the information was conveyed in the settlement conference." (Mot. to Disqualify Morgan & Morgan 16). However, no evidence was provided of this, and Bedoya's uncontroverted testimony gives no reason to believe he was solicited as a client. (*See* Mar. 20, 2012 Hearing Tr. 84–87). The Court does recognize that the content of the settlement discussions may have a direct bearing on the present case, since the question of how employee drivers are paid may have relevance to a showing of whether or not Bedoya was an independent contractor. Thus, Plaintiff's counsel have helped create a situation potentially ripe for a Bar rule violation, should they seek to introduce evidence from the confidential exchanges. Nevertheless, Defendants have not pointed the Court to any improper use of the confidential information that has already occurred, and as such the Court does not disqualify Celler or anyone else on this basis.[14]

### D.  Florida Bar Rule 4-4.4(b)

Under Florida Bar Rule 4-4.4, "[a] lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender." FLA. BAR R. PROF'L CONDUCT 4-4.4(b). "If a lawyer knows or reasonably should know that such a document was sent inadvertently, then this rule requires the lawyer to promptly notify the sender in order to permit that person to take protective measures." *Id.* cmt.

---

[14]   Defendants do argue that Celler learned Kleppin would be co-counsel in this matter through Defendants' inadvertent production of documents in the *Schatt* Action. (*See* Mot. to Disqualify Celler 3). Schulman alerted Coupal to the disclosure, stating that Plaintiff would mail the original document back to Defendants. (*See* Jan. 11, 2011 Email Exchange, Mot. to Disqualify Celler Ex. 2 [ECF No. 47-2]). Defendants' primary complaint appears to be that Plaintiff subsequently tried to name Padurjan as a witness and moved to disqualify Kleppin after the latter had filed a Notice of Appearance. Defendants do not explain why either of these two actions would constitute actionable conduct, however, and the Court does not find that they do, particularly since Schulman did appear to return the documents in question immediately, and as the Court has stated, Plaintiff's counsel's act in bringing Plaintiff's motion to disqualify Kleppin is not at issue here.

Defendants assert that Celler intercepted an inadvertently disclosed email sent by Kleppin to Coupal in the context of the *Coelho* Action.  (*See* Feb. 7, 2012 Email Exchange, Mot. to Disqualify Celler Ex. 4 [ECF No. 47-4]).  Defendants contend that Celler refused to return, sequester, or destroy the email in question, but rather attached it as an exhibit to a motion to disqualify Kleppin in the arbitration in connection with the *Coelho* Action.  (*See* Coelho Mot. to Disqualify, Mot. to Disqualify Celler Ex. 3 [ECF No. 47-3]).

Defendants have not given any explanation as to how this inadvertent disclosure in the *Coelho* Action has any bearing on the present case.  In fact, Defendants advise the Court that the arbitrator denied the motion to disqualify in the *Coelho* arbitration, for Celler to refile it with the court in the *Coelho* Action.  (*See* Mot. to Disqualify Celler 5).  As Defendants have not identified conduct before the Court which the Court has jurisdiction to sanction, the Court declines to rule on this alleged violation.

### E.  Florida Bar Rule 4-8.4

Florida Bar Rule 4-8.4 provides:

A lawyer shall not:

(a)  violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

*        *        *

(c)  engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, . . . ;

(d)  engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic; . . .

FLA. BAR R. PROF'L CONDUCT 4-8.4.

The Court finds multiple instances in which Plaintiff's counsel have violated this Rule. For example, the email exchange regarding the Tinkler communication contained such choice statements from Celler to Coupal as "you are not a trial lawyer;" "We are not interested, nor are our clients, in settlement discussions with you as long as you are the lawyer on the other side. You are causing your client a great disservice;" and "Nobody on this side of the internet cares." (Jan. 30, 2012 Email Exchange).  Celler himself acknowledges the utter lack of professionalism and impropriety of his emails to Coupal, expressing "remorse and disappointment" (Pl.'s Post-Hearing Br. 2 n.2), but chalks his behavior up to "zealousness on his client's behalf" and "vigorous[]" advocacy.  (Resp. 8–9).  Needless to say, Celler's emails are far beyond (and at the same time, far short of) what zealous advocacy would require.

Defendants also contend Plaintiff included an injurious false statement in the Padurjan Affidavit that Padurjan only settled his earlier action because of threats from Kleppin that Padurjan would be responsible for paying Kleppin's fees if Padurjan failed to settle.  (*See* Mot. to Disqualify Celler 6 n.6 (citing Padurjan Aff. ¶ 6)).  Defendants assert that "[t]his is entirely untrue, and was fabricated by Celler," perhaps on the basis of other firms' retainer agreements which contain a similar clause.  (*Id.*).  Plaintiff never rebuts this, and if Defendants are correct, the Court agrees such an accusatory statement should not have been made to the Court without any basis and likely runs afoul of Florida Bar Rule 4-8.4.  Padurjan's testimony established that there were at least a few additional statements in his own affidavit he could not endorse as true, including the statements regarding his wish to participate in this action.  As Plaintiff insists Celler did not personally participate in the Padurjan Affidavit (*see* Resp. 4 n.5), Schulman and/or Morgan & Morgan are likely responsible for this conduct.

In addition to the above, Defendants describe deplorable behavior on Celler's part that occurred in connection with the *Schatt* Action. Tinkler testified that during depositions he witnessed "Mr. Celler . . . drawing photos of — pictures of male genitalia and showing them to Ms. Schulman, describing Mr. Coupal. I told Mr. Coupal after that was occurring and he made mention about it." (Apr. 2, 2012 Hearing Tr. 17:2–5). Sorci testified that he observed Schulman "laugh[ing] quite a few times" at Celler's drawings, and that on break Schulman made a comment that "this is typical Richard [Celler], this is what he does at these sort of things." (*Id.* 85:5–10). Tinkler further stated that "during Mr. Schatt's deposition Mr. Celler was playing the game Angry Birds. He admitted it aloud and was bragging that he had just beaten somebody in Minnesota at the game during the deposition." (*Id.* 17:6–9). Moreover, Celler would wear a t-shirt and shorts to proceedings to gain "a psychological advantage." (*Id.* 17:11–15). Celler chose Dunkin' Donuts as the site of depositions against Coupal's wishes. According to Tinkler, the Dunkin' Donuts had:

> open glass, an open wall. You could hear the people. There was [sic] two video games right by where this gentleman is sitting. You could hear people the free Wifi video games. It's right near Nova's campus. There were people coming and going constantly through that area, high traffic area. They were yelling and screaming in the reception area where people were ordering their lunch and there was one bathroom that was flooded out and the door was locked constantly.

(*Id.* 55:12–19).

As this conduct occurred in another forum, it is not directly actionable here. Nonetheless, this conduct is relevant to the extent it speaks to Celler's violation of Florida Bar Rule 4-4.4 in embarrassing or burdening Defendants and interfering with their privileged relationship with Coupal in this action, of which the *ex parte* communication with Tinkler was a part. For example, Tinkler witnessed Celler, at the Dunkin' Donuts, "taunting" Coupal about Celler's "27 and 0 record," and about how Coupal will lose this case and "hides behind . . . his general

counsel title." (*Id.* 17:18–21).  Tinkler stated,

> I had to leave the room and I went into the reception area and then Mr.
> Coupal came and asked me what was the matter and I said, I could not listen to
> the way Mr. Celler was speaking to you.  It bothered me significantly.

(*Id.* 17:23–18:1).  This behavior, which Celler makes no attempt to deny, is relevant insofar as

Celler's course of conduct in disparaging Coupal, to Coupal's clients, has severely impacted

these proceedings.  Plaintiff glibly tries to downplay Celler's attire, the use of a Dunkin' Donuts

to host depositions, and "jokes he may have made," offering excuses that Morgan & Morgan's

conference room was undergoing construction.  (Pl.'s Post-Hearing Br. 16 & n.17).  Plaintiff

urges the Court to "consider the context of Mr. Celler's emails," as the antagonism between the

attorneys here "was not totally one-sided."  (*Id.* 16).  These juvenile arguments hardly excuse

Plaintiff's counsel's behavior, and the Court accords them no weight.

### F.      Disqualification

The question then is whether the various Florida Bar Rule violations — of Rule 4-4.2

with respect to Tinkler and Goetz, and Rule 4-8.4 as discussed above —constitute grounds for

disqualification.

"[A]s a general rule . . . disqualification of counsel under [Florida Bar Rule] 4-4.2 is not

presumptively required, and violations thereof should ordinarily be remedied in some other

way."  *Allstate Ins. Co. v. Bowne*, 817 So. 2d  994, 999 (Fla. 4th DCA 2002) (stating that the

"usual remedy" is to bar the *ex parte* acquisition of information during discovery or bar the use

of any improper communications already had).   The Court is conscious of the fact that

disqualification on the basis of *ex parte* contact is not an ordinary remedy.  However, this is not

an ordinary case.  The reasoning of the court in *Allstate* demonstrates that a common concern

with respect to *ex parte* contact is the improper acquisition of confidential information.  Here,

there is no allegation Celler acquired confidential information from Tinkler (although this was an issue with other individuals as addressed below). However, as stated, Celler's *ex parte* contact cut to the core of the opposing party's attorney-client relationship. The Court finds that in the instant case, the relationship between Celler, Defendants, and Defendants' counsel has been so impaired that the only proper remedy is Celler's disqualification. The various Florida Bar Rule 4-8.4 violations whereby Celler disparaged Coupal in front of Coupal's clients and generally acted with flagrant disrespect exacerbate the situation and show that the *ex parte* contact with Tinkler was merely one element of a consistent course of disrespectful, unprofessional conduct exhibited by Celler.

The violation of Florida Bar Rule 4-4.2 with respect to Goetz further supports Celler's disqualification, as well as that of Schulman. The substance of the contact with Goetz, which stretched over multiple days and actually resulted in an affidavit submitted against Defendants, goes to an issue central to the present action. The undisputed evidence shows both Celler and Schulman were notified of Coupal's objections to the contact, and both were fully involved in interviewing Goetz, preparing him, and obtaining his signed affidavit. The Court finds sufficient basis to disqualify Schulman from further participation in this action. Plaintiff should not be permitted to profit from the confidential information improperly obtained *ex parte* from Goetz.

Defendants have also moved to disqualify Morgan & Morgan. Plaintiff suggests that should Celler be disqualified, Schulman or other Morgan & Morgan attorneys would simply take primary responsibility for Plaintiff's case. Celler states, "While I intend to assist Ms. Schulman in *Ceant* and *Bedoya* if she asks for my assistance, she will remain in her role as primary counsel, and is more than capable of handling these matters alone and without my participation." (Celler Aff. ¶ 4). Murthy, from Morgan & Morgan, has also appeared in this matter. Schulman

testified there are seven attorneys practicing labor and employment law in the Morgan & Morgan office where she works with Celler.  (*See* Mar. 20, 2012 Hearing Tr. 6:17–24 [ECF No. 109]).  An additional three attorneys practice labor and employment law in the firm's Orlando office.  (*See id.* 6:25–7:1).  Celler is the managing partner of the labor and employment division at Morgan & Morgan, and all of the attorneys in the practice report directly to him.  (*See id.* 7:6–9).

Defendants cite *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080 (S.D.N.Y. 1989), for the proposition that improper *ex parte* communication is a basis for disqualification of an entire firm.  (*See* Mot. to Disqualify Morgan & Morgan).  In fact, *Papanicolaou* is an instructive case in which a plaintiff sought to disqualify not only an individual attorney for defendant, but that attorney's entire law firm.  The plaintiff in that matter had an *ex parte* communication lasting an hour and a half with a partner of the opposing party's firm, Milbank, when the plaintiff arrived at Milbank's office for a deposition.  *See* 720 F. Supp. at 1081–82.  During the conversation, the plaintiff discussed the merits of the case and showed the Milbank partner a key document, and the partner disparaged the competence of the plaintiff's attorneys, Kreindler and Kreindler.  *See id.* at 1082.

The court held that the "real litmus test" for disqualification was the probability of "taint of trial."  *Id.* at 1083.  The court found the substantive, privileged information discussed *ex parte* required disqualification, *see id.* at 1085, and the court questioned the effectiveness of the "Chinese wall" erected to protect the flow of privileged information at Milbank, *id.* at 1087.  The court moreover held:

> A Chinese wall seems an inappropriate prophylactic here for another reason.  Chinese walls are meant to isolate a client's confidences.  *Chinese walls are not designed to, and are not able to, contain the effects of deprecation.*  Model Rule 4.2[15] protects parties from the potential consequences of the possession of confidential information; but it also sustains the integrity of the relationships

---

[15]  Model Rule 4.2, examined by the *Papanicolaou* court, is virtually identical to Florida Bar Rule 4-4.2.

> between both an attorney and his client and an attorney and his opponent. The responsible Milbank partner disparaged Kreindler's competence. *His comments are alleged to have upset the equilibrium of the relationship between Kreindler and its client, the plaintiff.* In the conduct of litigation it is essential that the attorney have the full confidence of his client. Attorney-client relationships are delicate and may never fully recover from such attacks. According to Kreindler, the partner has also made it difficult for the firm to maintain a normal, professional adversarial relationship with Milbank. If the relationship between the attorneys in this case has deteriorated to the extent that plaintiff's counsel cannot feel secure, the course of the trial may well be affected, with resulting adverse consequences for the plaintiff.

*Id.* at 1087 (footnote call number omitted) (emphasis added). The court therefore disqualified the entire Milbank firm as well as the partner who had disparaged the plaintiff's attorney. *See id.*

This language aptly describes what has occurred in this case. It is evident that Celler's actions with respect to Defendants, and throughout this case, have so damaged the adversarial process that any trial may well be tainted. Furthermore, given the small size of the Morgan & Morgan labor practice, the Court is not convinced that a Chinese wall — and removing solely Celler and Schulman from this case — would have any effectiveness. If there are seven attorneys practicing labor and employment law in Celler's office as Schulman testified, three of them have already appeared in this case. Up to this point, Celler and Schulman have hardly demonstrated the scrupulousness that would be required to enforce a Chinese wall, and in the words of the *Papanicolaou* court, the "Court doubts whether any Chinese walls, which are meant to be preemptive, can ever function effectively when erected in response to a motion, and not prior to the arising of the conflict." *Id.* at 1087.

The Court finds that the appropriate remedy in this matter is to disqualify the Morgan & Morgan law firm from representation of Plaintiff in this action. In so finding, the Court is influenced by the egregiousness of the Florida Bar Rule violations, and the grave impact Celler's disparaging acts have had on the attorney-client relationship between Coupal and Defendants.

The severity of the remedy matches that of the violations.

#### F.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1.    The Motion to Disqualify Celler **[ECF No. 47]** is **GRANTED**.  Celler is disqualified from representing Plaintiff as counsel in this matter and relieved of all further responsibilities related to Plaintiff in these proceedings.

2.    The Motion to Disqualify Morgan & Morgan **[ECF No. 82]** is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of May, 2012.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record